# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# JACKSONVILLE, FLORIDA

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel*, [SEALED]<br><br>        Plaintiffs-Relators,<br><br><br>                v.<br><br><br>[SEALED]<br><br>        Defendant. | No: _____<br><br>FILED UNDER SEAL AND IN CAMERA PURSUANT TO 31 U.S.C. § 3730(b)<br><br>DO NOT ENTER ON PACER |

## RELATORS' COMPLAINT UNDER THE FALSE CLAIMS ACT

1

# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# JACKSONVILLE, FLORIDA

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel*,<br>Jasmine Davis and Justice King<br>Plaintiffs-Relators,<br><br><br>v.<br><br><br><br>SKINCURE ONCOLOGY, LLC,<br>a Delaware limited liability company<br>Defendant. | <br><br><br><br>**FILED UNDER SEAL DO<br>NOT PLACE ON PACER<br>JURY TRIAL DEMANDED** |

Relators Jasmine Davis and Justice King ("Relators"), on behalf of the United States of America, bring this action against Defendant SkinCure Oncology, LLC, a Delaware limited liability company ("SkinCure") for violations of the False Claims Act ("FCA"), 31 U.S.C. § 3729, et seq., to recover all available damages, civil penalties, and all other recoveries.

## I.    SUMMARY OF THE CASE

1.    Non-melanoma skin cancer is, by definition, a cancer that manifests on the surface of a person's body and can be seen by the naked eye.

2.      One medically-accepted method of treating non-melanoma skin cancer is surgical removal, i.e., making incisions in the patient's skin and cutting the cancer out of the patient's body.

3.      Superficial radiation treatment ("SRT") is a medically-accepted, non-surgical, and non-invasive alternative to surgical methods of treatment for non-melanoma skin cancer. SRT has been used by dermatologists and radiation doctors worldwide for over 80 years.

4.      Prior to the radiation treatments themselves, doctors evaluate the patient's cancer in order to prepare the appropriate course of radiation treatment. This evaluation, which is often called a "simulation" in practice, is billed under a billing code known as CPT 77280.[1]  Medicare reimburses approximately $313 for CPT 77280.

5.      Once the evaluation is complete and the doctor prescribes the appropriate amount of radiation – and a schedule for the application of SRT – the SRT treatments begin.

---

[1]  The Current Procedural Terminology ("CPT") coding system is used by medical providers to report services and seek reimbursement for same. *See United States v. Fadul*, No. DKC 11–0385, 2013 WL 781614, at *1 (D. Md. Feb. 28, 2013) ("To reimburse health care providers, private and public insurers (including Medicare and Medicaid) use an alphanumeric coding system established by the American Medical Association and published in the Current Procedural Terminology.").

6.    A typical course of SRT involves 20 treatments spread out over a period of 1-2 months.

7.    SRT is a simple treatment.  It is billed using CPT 77401.  Medicare typically reimburses providers only $27 per treatment.  The approximate amount of revenue that a physician practice will receive for 20 treatments combined is $540 ($27 x 20 = $540).

8.    Thus, a physician treating a patient with non-melanoma skin cancer using SRT will typically generate revenue of: 1) approximately $853 if the doctor conducts an evaluation/simulation and performs 20 radiation treatments ($313 + $540 = $853), or 2) approximately $540 if the doctor does not conduct an evaluation/simulation and simply provides 20 treatments ($27 x $20 = $540).

9.    Internal cancers, such as lung cancer or prostate cancer, cannot be seen by the naked eye.  Instead, doctors use imaging machines such as ultrasounds, CT scans, or MRIs to image the internal tumors.

10.    Image Guided Radiation Therapy ("IG-RT") has been used for ten to fifteen years for treatment of internal cancers.  IG-RT uses the chosen imaging machine to direct the application of radiation to internal cancers that cannot be visualized with the naked eye.

11.     The use of an imaging machine is typically billable at a much higher rate than the $27 per treatment for SRT.  For example, ultrasound is billed under CPT G6001, and Medicare reimburses approximately $131 per use.

12.     SkinCure's fraudulent scheme involves creating illegal financial relationships with physicians which incentivizes physicians to provide medically unnecessary services to patients.

13.     These medically unnecessary services include: a) billing for an evaluation/simulation at every single SRT treatment (doctors typically conduct only one evaluation prior to initiating SRT treatment), b) using ultrasound imaging to treat skin cancer (even though non-melanoma skin cancer can be seen with the naked eye, and ultrasound provides no medical benefit to the patient), and c) billing for services which must be conducted or supervised by a physician, but which are unsupervised.

14.     To accomplish this fraud, SkinCure created a treatment it calls "Image-Guided Superficial Radiotherapy Treatment" ("IG-SRT") for patients with non-melanoma skin cancer.

15.     Each so-called "IG-SRT" treatment includes, *inter alia*, an evaluation billed under CPT 77280, and the use of ultrasound.  These evaluations (beyond the initial evaluation) and all of the ultrasounds are medically unnecessary, i.e., "IG-SRT" as carried out in practice by SkinCure is not a medically accepted treatment for non-melanoma skin cancer.

5

16.    Moreover, the evaluations and the ultrasounds are conducted by unsupervised employees of SkinCure.

17.    Having created "IG-SRT" out of thin air, SkinCure partners with dermatology practices to provide the capital, resources, office construction, training, technicians, *and billing services* for an in-office "IG-SRT" practice.

18.    Once this package of free goods is received by the physician practice, the practice returns the favor by: 1) referring patients to the new "IG-SRT" room, and 2) providing SkinCure with 60% of the revenue produced by the "IG-SRT" treatments.

19.    As noted, Medicare typically reimburses providers approximately $313 per evaluation (billed under CPT 77280), and $131 per ultrasound use (billed under code G6001).

20.    In SkinCure's scheme, there are 21 evaluations billed under CPT 77280 over the course of 4-8 weeks (an initial evaluation, then additional evaluations every time the patient comes in for his/her 20 SRT treatments). The cost to Medicare for 21 evaluations billed under CPT 77280 is approximately $6,573 (21 x $313 = $6,573).

21.    In SkinCure's scheme, there are 25 ultrasounds billed under G60012 over the course of 4-8 weeks. The cost to Medicare for 25 ultrasounds billed under G6001 is approximately $3,275 ($131 x 25 = $3,275).

22.   The exhibit below, which was created by SkinCure, shows the typical treatment and billing cycle for a SkinCure patient with a single lesion of non-melanoma skin cancer:

| CPT CODE | DESCRIPTION | Number of Units Per Course | National Average Global MAC Reimbursement Allowable | Totals Based on the Number of Units | Primary |
|---|---|---|---|---|---|
| 77261 | Therapeutic Radiology Treatment Planning | 1 | 77.94 | 77.94 | 62.35 |
| 77280 | Image Guided Field Placement | 21 | 313.17 | 6,576.57 | 5,261.26 |
| 77300 | Radiation Therapy Dose Plan-Field Calculation | 1 | 73.62 | 73.62 | 58.90 |
| 77331 | Special Radiation Dosimetry | | 71.24 | 0.00 | 0.00 |
| 77334 | Radiation Treatment Aid(s) | 1 | 141.48 | 141.48 | 113.18 |
| 77336 | Radiation Physics Consult Weekly | 4 | 90.34 | 361.36 | 289.09 |
| 77401 | SRT Delivery | 20 | 27.71 | 554.20 | 443.36 |
| 77427 | Radiation Management Weekly | 4 | 208.12 | 832.48 | 665.98 |
| 99211 | Simple Office Visit | | 23.07 | 0.00 | 0.00 |
| 99213 | Intermediate Office Visit | | 75.32 | 0.00 | 0.00 |
| 99214 | Complex Office Visit | 1 | 110.28 | 110.28 | 88.22 |
| G6001 | Ultrasound Evaluation - Ultrasound Guidance | 25 | 131.18 | 3,279.50 | 2,623.60 |
| | | | | | 9,605.94 |

*See* Ex. 1 (SkinCure Treatment and Billing Protocol).

23.   Thus, instead of Medicare paying approximately $853 for SRT treatment provided under the applicable medical standard of care, Medicare pays that amount *PLUS*, at least,[2] an additional $9,848 ($6,573 + $3,275 = $9,848) for care which is medically unnecessary and which is provided in violation of the AKS and the Stark Law.

24.   This scheme results in a massive number of false claims being submitted to, and paid by, government healthcare programs, including Medicare.  These

---

[2] There are other false bills submitted in connection with SkinCure's scheme which will be discussed in the body of this Complaint, below.

claims are false for two primary reasons: 1) they are tainted by kickbacks and violations of the Stark Law, and 2) they are for medically unnecessary services.

25.    Certain claims, as described more fully below, are also false because they represent that physicians performed or supervised the services, when they did not. Finally, certain claims are false because they do not warrant payment under the applicable billing codes.

## II.    THE PARTIES

26.    Defendant SkinCure Oncology was formed as a limited liability company organized under the laws of the State of Delaware in October 2016 and maintains its principal place of business in Illinois.

27.    Relators Jasmine Davis and Justice King are medical billing specialists and former employees of SkinCure Oncology and bring this action on behalf of the United States.

28.    Relators have standing to bring this action pursuant to 31 U.S.C. § 3730(b)(1).

## III.    JURISDICTION AND VENUE

29.    Jurisdiction is founded under 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1331 and 1345.

30.    Personal jurisdiction and venue are proper in the Middle District of Florida pursuant to 28 U.S.C. § 1391(b)(2) and 31 U.S.C. § 3732(a) because acts proscribed by 31 U.S.C. § 3729 have occurred in the Middle District of Florida.

## IV.    APPLICABLE LAW

### A.    The False Claims Act

31.    The FCA "was passed in 1863 as a result of investigations of the fraudulent use of government funds during the Civil War." *United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968).  It creates "a scheme that permits either the Attorney General or a private party to initiate a civil action alleging fraud on the Government," *United States ex rel. Eisenstein v. City of New York, New York*, 556 U.S. 928, 932 (2009) (citations omitted), and "imposes significant penalties on those who defraud the Government," *Universal Health Servs., Inc. v. United States*, 136 S. Ct. 1989, 1995 (2016).

32.    As relevant here, the FCA establishes treble damages liability for the Government where an individual or entity:

    a.    "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1)(A); or

    b.    "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," *id.* § 3729(a)(1)(B).

33.    Thus, under 31 U.S.C. § 3729(a)(l)(A), the FCA is violated not only by a person who submits a false claim, but also by one who ***causes another*** to submit a false claim. *United States ex rel. Bunk v. Birkart Globistics GMBH & Co.*, Nos. 1:02cv1168(AJT/TRJ), 1:07cv1198(AJT/TRJ), 2011 WL 5005313, at *7 n. 10 (E.D. Va. Oct. 19, 2011) ( quoting jury instruction on "Causing False Claim to Be Filed"); *United States ex rel. Schmidt v. Zimmer, Inc.*, 386 F.3d 235, 242–245 (3rd Cir. 2004) (applying "substantial factor" and "normal consequence" test); *United States ex rel. Freedman v. Suarez-Hoyos*, No. 8:04–cv–933–T–24 EAJ, 2012 WL 4344199, at *8 (M.D. Fla. Sept. 21, 2012).

34.    As applied by the courts, the standard for "causation" under the FCA is whether the submission of a false or fraudulent claim was "reasonably foreseeable" from a Defendant's actions. Under this standard, a Defendant's fraudulent conduct can occur anywhere in the chain of events leading to financial loss by the government, and can be an indirect, as well as direct, cause of the loss. Moreover, the Defendant need not be the recipient or beneficiary of the false claim. All that is required is that the Defendant, by its fraudulent conduct, sets in motion a series of events which results in a reasonably foreseeable loss to the government.

35.    The terms "knowing" and "knowingly" mean "that a person, with respect to information (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless

disregard of the truth or falsity of the information...." 31 U.S.C. § 3729(b)(1)(A)(i)–(iii). However, proof of specific intent to defraud is not required. 31 U.S.C. § 3729(b)(1)(B).

36.   The term "claim" means "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded...." 31 U.S.C. § 3729(b)(2)(A)(i)–(ii).

37.   The term "material" means "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

38.   Pursuant to the Civil Monetary Penalties Inflation Adjustment Act, the civil monetary penalties under the FCA range from $11,803 to $23,607 for violations occurring on or after November 2, 2015, that are assessed after December 13, 2021. *See* 28 C.F.R. § 85.5.

11

### B. The Anti-Kickback Statute

39.    The federal AKS makes it a criminal offense to "knowingly and willfully" offer or pay any remunerations to induce referrals of items or services paid for by a federal health care program. 42 U.S.C. § 1320a–7b. The AKS likewise makes it a criminal offense to "knowingly and willfully" solicit or receive any remuneration for referrals of items or services paid for by a federal health care program. *Id.*

40.    If any purpose of the remuneration is to induce or reward the referral or recommendation of business payable in whole or in part by a federal health care program, the AKS is violated, i.e., a lawful purpose will not legitimize a remuneration that also has an unlawful purpose. Specifically, the AKS provides:

(1) Whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind—

    a.    in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

    b.    in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $100,000 or imprisoned for not more than 10 years, or both.

(2) Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—

> a.    to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

> b.    to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $100,000 or imprisoned for not more than 10 years, or both.

42 U.S.C. § 1320a-7b(b)(1)–(2).

41.    "Federal health care program" is defined as "(1) any plan or program that provides health benefits, whether directly, through insurance, or otherwise, which is funded directly, in whole or in part, by the United States Government (other than the health insurance program under chapter 89 of Title 5); or (2) any State health care program, as defined in section 1320a-7(h) of this title." 42 U.S.C. § 1320a-7b(f).

42.    "Federal health care program" includes, *inter alia*, Medicare, Medicaid, and the Veterans Health Administration. *See id.*

43.    While "[i]n some industries, it is acceptable to reward those who refer business to you…in the Federal health care programs, paying for referrals is a crime."[3]

44.    Violation of the AKS can subject the perpetrator to exclusion from participation in federal healthcare programs and civil monetary penalties of $100,000 per violation and three times the amount of remuneration paid.  42 U.S.C. § 1320a-7a(a)(7).

45.    In addition, reimbursement claims to federal health care programs that are tainted by violations of the AKS are false claims within the meaning of the FCA. 42 U.S.C. § 1320a-7b(g) ("In addition to the penalties provided for in this section or section 1320a-7a of this title, a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of subchapter III of chapter 37 of Title 31.").

**C.    The Stark Law**

46.    The Stark Law prohibits providers from submitting claims to Medicare for services provided to patients who were referred by a physician with whom the provider has an impermissible "financial relationship."  42 U.S.C. § 1395nn(a)(1). The Stark Law establishes a presumptive rule that providers may not bill, and

---

[3]    HHS-OIG, *A Roadmap for New Physicians: Fraud & Abuse Laws*, https://oig.hhs.gov/compliance/physician-education/01laws.asp (last visited April 13, 2022).

Medicare/Medicaid will not pay, for certain health care services generated by a referral from a physician with whom the provider has a financial relationship.[4]

47.    In relevant part, the Stark Law states:

(a) Prohibition of certain referrals

(1) In general
Except as provided in subsection (b) of this section, if a physician (or an immediate family member of such physician) has a financial relationship with an entity specified in paragraph (2), then—

(A) the physician may not make a referral to the entity for the furnishing of designated health services for which payment otherwise may be made under this subchapter, and

(B) the entity may not present or cause to be presented a claim under this subchapter or bill to any individual, third party payor, or other entity for designated health services furnished pursuant to a referral prohibited under subparagraph (A).

* * * * *

(g) Sanctions
(1) Denial of payment
No payment may be made under this subchapter for a designated health service which is provided in violation of subsection (a)(1) of this section.
(2) Requiring refunds for certain claims
If a person collects any amounts that were billed in violation of subsection (a)(1), the person shall be liable to the individual for, and

---

[4] *See* HHS-OIG, *A Roadmap for New Physicians: Fraud & Abuse Laws*, https://oig.hhs.gov/compliance/physician-education/01laws.asp (last visited April 5, 2022) (describing the Stark Law as a strict liability statute).

shall refund on a timely basis to the individual, any amounts so collected.

42 U.S.C. § 1395nn(a)(1) and (g)(1)–(2).

48.    The Stark Law broadly defines "financial relationship" to include any "compensation arrangement" between the provider and the referring physician. 42 U.S.C. § 1395nn(a)(2). "Compensation arrangement" is further defined to mean "any arrangement involving any remuneration between a physician . . . and an entity...." 42 U.S.C. § 1395nn(h)(1)(A). "Remuneration" means "any remuneration, directly or indirectly, overtly or covertly, in cash or in kind." 42 U.S.C. § 1395nn(h)(1)(B).

49.    The Stark Law defines "referral" as "the request by a physician for the item or service, including the request by a physician for a consultation with another physician (and any test or procedure ordered by, or to be performed by (or under the supervision of) that other physician)...." 42 U.S.C. § 1395nn(h)(5)(A). The "oft-stated goal" of the Act is "to curb overutilization of services by physicians who could profit by referring patients to facilities in which they have a financial interest." *See* Jo-Ellyn Sakowitz Klein, *The Stark Laws: Conquering Physician Conflicts of Interest?* 87 GEO. L.J. 499, 511 (1998).

50.    Once the relator or the government establishes the existence of referrals and a financial relationship, the burden shifts to the defendant to establish that its

16

conduct fits into one of the Stark Law's "exceptions." *See, e.g., United States v. Halifax Hosp. Med. Ctr.*, No. 6:09-CV-1002-ORL-31, No. 6:09–cv–1002–Orl–31TBS, 2013 WL 6017329, at *6 (M.D. Fla. Nov. 13, 2013) (quotations omitted) ("Once the Government has demonstrated proof of each element of a violation of the Stark Statue, the burden shifts to the defendant to establish that his conduct was protected by a safe harbor or exception. The Government need not prove, as an element of its case, that a defendant's conduct does not fit within a safe harbor or exception.").

## V.    BACKGROUND

### A.    The Medicare Program

51.    The Medicare Program, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, *et seq.* ("Medicare") is a health insurance program administered by the United States that is funded by taxpayer revenue.  The program is overseen by the United States Department of Health and Human Services.  Medicare was designed to be a health insurance program and to provide for the payment of hospital services, medical services, and durable medical equipment.  Medicare provides health insurance benefits to (1) individuals who are 65 or older, (2) individuals with certain disabilities, and (3) individuals suffering from end stage renal disease. *See* 42 U.S.C. § 1395c.

52.    Part A of the Medicare program authorizes payment for institutional care, including hospital, skilled nursing facility, and home health care.

53.    Medicare Part B, which is particularly relevant to the allegations raised herein, authorizes payment for physician and ancillary services.

54.    Medicare Part B is funded by insurance premiums paid by enrolled Medicare beneficiaries and contributions from the federal treasury. The Centers for Medicare & Medicaid Services ("CMS") contracts with private insurance companies to administer, process and pay Medicare Part B claims from the Federal Supplementary Medical Insurance Trust Fund. *See* 42 C.F.R. §§ 405.904(a), 421.3, 421.100. The private insurance companies that contract with CMS to provide these services are called Medicare Administrative Contractors, previously known as Medicare Part B carriers.[5]

55.    Medicare does not cover expenses incurred for items or services "[that] are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y(a)(1)(A).

56.    Throughout the relevant period, the services described herein were provided to beneficiaries of Medicare.

---

[5] *See* What's a MAC, CENTERS FOR MEDICARE & MEDICAID SERVICES, https://www.cms.gov/Medicare/Medicare-Contracting/Medicare-Administrative-Contractors/What-is-a-MAC (last visited April 13, 2022).

### B.    The CPT Coding System

57.    As noted, the CPT coding system is used by medical providers to report services and seek reimbursement for same. *See United States v. Fadul*, No. DKC 11–0385, 2013 WL 781614, at *1 (D. Md. Feb. 28, 2013) ("To reimburse health care providers, private and public insurers (including Medicare and Medicaid) use an alphanumeric coding system established by the American Medical Association and published in the Current Procedural Terminology.").

58.    The American Medical Association creates CPT codes and describes them as:

> ...a uniform language for coding medical services and procedures to streamline reporting, increase accuracy and efficiency....    The CPT terminology is the most widely accepted medical nomenclature used across the country to report medical, surgical, radiology, laboratory, anesthesiology, genomic sequencing, evaluation and management (E/M) services under public and private health insurance programs..[6]

59.    CPT codes for radiation therapy generally have both a professional and a technical component. *See* Medicare Claims Processing Manual, Chapter 23, Section 50.6, Professional Component (PC)/Technical Component (TC) Indicator.

---

[6] AMERICAN MEDICAL ASSOCIATION, CPT Overview and Code Approval, https://www.ama-assn.org/practice-management/cpt/cpt-overview-and-code-approval (last visited April 13, 2022).

60.    The technical component relates to the performance of the test itself, i.e., it reimburses the billing entity for providing the personnel and equipment required to conduct the procedure, e.g., radiation therapy.

61.    The professional component relates to the interpretation of the results of the procedure by a qualified medical provider, and the production of a report describing the results, e.g., a report describing the results of the radiation therapy.

62.    Many codes require the medical biller to append the modifier "TC" to the code when reporting only the technical component and to append the modifier "26" to the code when reporting only the professional component. When the same provider renders both the professional and technical components, no modifier is required. *See id.*

63.    This professional/technical distinction arose because radiation oncologists originally partnered with hospitals to perform their services. Medicare separated the professional and technical billing to funnel funds to the physician practices for their services and to the hospitals for providing use of the radiation equipment. The professional and technical components of a code together make up one medical procedure, and most procedures in the radiation therapy context must thus be performed by the physician.

64.    The exception to the professional/technical combination of coding in radiation therapy are CPT codes 77401–77416. Medicare assigns these codes for

purely technical services to be performed solely by the radiation technician in delivering radiation treatment. *See* Medicare Claims Processing Manual, Chapter 13, Section 70.3.

65.    That said, even when the radiation therapist delivers the radiation treatment under codes 77401-77416, the physician must still supervise the treatment. The Medicare Benefit Policy Manual provides that these technical services **"require direct personal supervision of a physician. The physician need not be in the same room, but must be in the area and immediately available to provide assistance and direction throughout the time the procedure is performed."** Medicare Benefit Policy Manual, Chapter 15, Covered Medical and Other Health Services, § 90. Moreover, the physician themselves must be qualified to provide the radiation under the law of the state where the radiation is applied.

**C.    Government Insurance Coverage Determinations**

66.    Medicare contracts with private entities known as Medicare Administrative Contractors ("MAC"). *In re Precedent Health Ctr. Operations, LLC*, 392 F. App'x 618, 619 n. 2 (10th Cir. 2010).

67.    The United States is divided into geographic jurisdictions, and each MAC is assigned to one or more of the jurisdictions.[7]

---

[7] CENTERS FOR MEDICARE & MEDICAID SERVICES, A/B MAC Jurisdictions as of June 2021, https://www.cms.gov/files/document/ab-jurisdiction-map-jun-2021.pdf.

68.    MACs are responsible for, *inter alia*, processing claims submitted by providers, determining the amount of payment to which a provider is entitled, and making payments to providers. *Prime Healthcare Services–Montclair, LLC v. Hargan*, No. CV 17–659 PA (JCx), 2018 WL 333862, at *1 (C.D. Cal. Jan. 9, 2018) ("Medicare service providers submit claims for reimbursement, and Medicare Administrative Contractors make initial determinations of coverage and amount.").

69.    MACs may adopt local coverage determinations ("LCD"), which are "determination[s] by a fiscal intermediary or a carrier . . . respecting whether or not a particular item or service is covered" by Medicare.  42 U.S.C. § 1395ff(f)(2)(B). As Medicare describes it, "LCDs are decisions made by a Medicare administrative contractor (MAC) whether to cover a particular item or service in a MAC's jurisdiction (region) in accordance with Section 1862(a)(1)(A) of the Social Security Act...The MAC's decision is based on whether the service or item is considered reasonable and necessary."[8]

70.    A "MAC may, by way of a Local Coverage Determination (LCD), make its own determination as to whether an item or service is reasonable and necessary—and, therefore, covered by Medicare." *Whitcomb v. Burwell*, No. 13–CV–

_____

[8]  MEDICARE.GOV, Local Coverage Determinations (LCD) challenge, https://www.medicare.gov/claims-appeals/local-coverage-determinations-lcd-challenge (last visited April 13, 2022).

990, 2015 WL 3397697, at *1 (E.D. Wis. May 26, 2015). An LCD "is binding throughout that contractor's jurisdiction." *Id.*; *see also United States ex rel. Youn v. Sklar*, No. 10 CV 5583, 2017 WL 3441878, at *5 (N.D. Ill. Aug. 7, 2017).

**D.    The Claim Submission Process**

71.    Providers submit claims for reimbursement for medical services and equipment by using CMS Form 1500 or its electronic equivalent.

72.    The provider must sign the form (field number 31) and attest to the certifications found on the reverse side of CMS Form 1500.

73.    These certifications include the following relevant statements (with added emphasis):

> In submitting this claim for payment from federal funds, I certify that: (1) the information on this form is true, accurate, and complete; (2) I have familiarized myself with all applicable laws, regulations, and program instructions, which are available from the Medicare contractor; (3) I have provided or will provide sufficient information required to allow the government to make an informed eligibility and payment decision; (4) **this claim, whether submitted by me or on my behalf by my designated billing company, complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment including but not limited to the Federal anti-kickback statute and Physician Self-Referral law (commonly known as Stark law); (5) the services on this form were medically necessary and personally furnished by me or were furnished incident to my professional service by my employee under my direct supervision, except as otherwise expressly permitted by Medicare or TRICARE;** (6) for each service rendered incident to my professional service, the identity (legal name and NPI, license #, or SSN) of

> the primary individual rendering each service is reported in the designated section.

74.    A company "causes" the presentment of false claims when its conduct is the proximate cause of the false claim. *See United States ex rel. Schiff v. Marder*, 208 F. Supp. 3d 1296, 1312 (S.D. Fla. 2016) ("Although the FCA does not define the phrase 'cause to be presented,' courts have applied traditional concepts of proximate causation to determine whether there is a sufficient nexus between the Defendants' conduct and the ultimate presentation of the alleged false claim.") (citations and quotations omitted).

75.    In order to qualify for reimbursement, medical claims submitted to government insurance programs must be for medically reasonable and necessary services. 42 U.S.C. § 1395y(a)(1)(A).

76.    The Medicare Program Integrity Manual ("PIM") provides further guidelines regarding whether a medical service is reasonable and necessary. Specifically, the PIM provides that in order to meet the reasonable and necessary requirement, the service must be:

> Appropriate, including the duration and frequency that is considered appropriate for the item or service, in terms of whether it is:
>
> - Furnished in accordance with accepted standards of medical practice for the diagnosis or treatment of the patient's condition or to improve the function of a malformed body member;

- Furnished in a setting appropriate to the patient's medical needs and condition;
- Ordered and furnished by qualified personnel;
- One that meets, but does not exceed, the patient's medical need; and
- At least as beneficial as an existing and available medically appropriate alternative.

Medicare Program Integrity Manual, § 13.5.4.

77. Through the below-described conduct, SkinCure caused physicians to submit medically unnecessary false claims to government insurers, and such reimbursement claims were the direct, foreseeable, and intended consequence of SkinCure's conduct.

## VI.    FACTUAL ALLEGATIONS

### A.    SkinCure Leadership

78. SkinCure, co-founded in 2016 by Steven L. Scott and Kerwin J. Brandt, provides IG-SRT to patients diagnosed with non-melanoma skin cancer.

79. SkinCure's Chief Executive Officer is Kerwin J. Brandt.

80. SkinCure's Chief Medical Officer is Dr. Daniel J. Ladd Jr. Dr. Ladd is a dermatologist who owns and operates seven dermatology offices under the name "Tru-Skin Dermatology."

81. SkinCure's Chief Operating Officer and Radiation Safety Officer is Steven L. Scott.

82.    SkinCure's National Director of Practice Operations is Joshua Swindle.

83.    SkinCure's Controller is Cathryn Klimek.

**B.    SkinCure's Non-melanoma Skin Cancer Treatments**

84.    Non-melanoma skin cancer is typically located in the outer layer of the skin.  The traditional treatment for this type of cancer is some form of removal by excision or surgery.  Such procedures are inherently invasive and require cutting the cancer out of the patient's body.

85.    SkinCure touts "IG-SRT" as a more appealing alternative to surgical options because unlike surgery, "IG-SRT" is non-invasive.

86.    SkinCure claims that "IG-SRT" is a safe and effective alternative to surgery because it "kills skin cancer cells using low levels of X-ray energy … [with] treatment … given in small doses over time."[9]

87.    But "IG-SRT" as created by SkinCure involves various medical procedures which, in addition to being medically unnecessary as defined by Medicare, do not  comport with the standard of care for medical professionals who treat non-melanoma skin cancers.

---

[9] https://www.gentlecure.com/faq/ (last visited Apr. 13, 2022) (Gentlecure is a trademark of SkinCure. It is the name used by SkinCure for a website which gives the appearance of being a third-party patient education resource for patients seeking treatment for non-melanoma cancers, but in reality is nothing more than a SkinCure promotional advertisement for "IG-SRT" treatment.)

88.    For example, the "IG" in "IG-SRT" involves using ultrasound for so-called "image guidance." While ultrasound may be necessary to treat serious internal cancers, using ultrasound does not meet applicable standards of medical care when used on superficial skin cancer, which is detectable by the naked eye.[10]

89.    Similarly, while some physicians will conduct an initial evaluation/simulation of a patient's non-melanoma skin cancer in order to help guide the appropriate course of SRT treatments, SkinCure's uniform practice of billing an evaluation/simulation, CPT 77280, twenty more times (every time the patient comes in for SRT treatment) does not meet applicable standards of medical care.

### C.    SkinCure's Business Model

90.    SkinCure does not maintain a dermatology practice. Instead, it teams with dermatology practices across the United States to make money. At present, SkinCure has partnerships with at least 200 dermatology practices.

91.    According to a video pitch on its website[11], SkinCure "provides the capital and resources for bringing IG-SRT to [a dermatology] practice" and will "cover the upfront cost of introducing and implementing" IG-SRT into the practice.

---

[10] The only "evidence" Skin Cure gives to potential dermatology partners regarding why IG-SRT should be used on superficial cancer are medical studies which are co-authored or authored by Lio Yu MD, who receives educational grants from SkinCure.

[11] *Our Business Model: Why Partner with SkinCure Oncology?*, SkinCure, https://www.skincureoncology.com/business-model/#comprehensiveSolution (last visited Apr. 13, 2022).

92.     SkinCure's website identifies nine specific areas of support it provides to dermatologists:

a.     Equipment procurement.

b.     Regulatory approval and compliance.

c.     Treatment room renovation.

d.     Machine installation and calibration.

e.     Clinical treatment and support team.

f.     Education and training.

g.     Practice metrics and reporting.

h.     Business operations.

i.     Medical documentation.[12]

93.     In connection with providing these services, SkinCure enters so-called Program Services Agreements ("PSA") with each dermatology practice with which it partners.  The PSA sets forth all of the functions SkinCure is responsible for, including support services for medical claim reimbursement, human resources recruitment and management, and monitoring of patient satisfaction and outcome.

94.     SkinCure promotes the impact its business model has on a dermatologist's ability to attract and retain patients, which is "code" for making money.  For example, SkinCure states on its website that "[t]he technological and administrative

---

[12] *Id.*

28

support provided by SkinCure Oncology allows you [the physician] to spend your practice hours more flexibly. It especially frees you up to interact with patients – the kind of interaction that leads to patient retention, higher patient satisfaction ratings, and a healthier practice."[13]

### D.    SkinCure's Partnering with Physicians

95.    In partnering with the dermatology practice, SkinCure undertakes all of the costs and the vast bulk of the work. It builds the radiation suite at the physician's practice, including buying all of the equipment and paying all construction costs. It obtains all necessary permits. It provides billing and other support services. And it "leases" a radiation technician employed by SkinCure to the practice. The radiation technician performs all of the ultrasound and radiation treatments.

96.    In return, the physician provides patients for treatment.

97.    The patients then undergo approximately 20 sessions of IG-SRT, which are then billed to government payers.

98.    Pursuant to the PSA, the partner physician receives 40% of these payments.

---

[13] *Our Business Model: IG-SRT Offers More Time to Interact with Patients*, SkinCure, https://www.skincureoncology.com/business-model/#comprehensiveSolution (last visited Apr. 13, 2022) ("With IG-SRT featured on your website, IG-SRT educational materials in your waiting room, and state-of-the art IG-SRT equipment and specially trained staff in your treatment room, you're sending a clear message to patients: You're invested in the latest medical technologies and offer highly effective, less invasive treatment options ....")

99.    SkinCure receives the greater of (a) 60% of the practice's net collections from IG-SRT radiation treatment, or (b) $2,500 for each course of IG-SRT radiation treatment provided to a patient, subject to a sliding scale based on the number of patients.[14]

### 1.    Setting up the Radiation Therapy Suite and Lease of a Radiation Therapist to the Practice

100.    Once the dermatologist and SkinCure decide to partner, SkinCure sends the dermatologist the PSA. The PSA sets forth the terms and conditions of the parties' arrangement. The dermatologist then sends back an executed PSA, formalizing the financial relationship between the practice and SkinCure.

101.    After SkinCure receives the executed PSA, its "Director of Implementation" contacts the dermatologist to discuss a timeline for getting the business started and to review what is required, including office construction, registration with the relevant state agency, equipment installation, training, hiring of radiation therapists, administrative support, verification of benefits and claims integrity support, and the electronic health record documentation process.

102.    During this time, SkinCure also assigns a "Regional Director" to the practice. The Regional Director provides support on practice metrics, reporting, clinical outcomes, and education. SkinCure also provides an "Implementation

---

[14] The sliding scale is determined by the average number of patients treated daily over a three consecutive month period.

specialist" who works with the practice's electronic medical record ("EMR") provider to ensure proper setup.

103.   After the implementation process, SkinCure comes in and renovates a room within the dermatologist's office into a radiation therapy suite. This is a specialized process, as it requires extensive experience working with, for example, radiation-shielding materials.

104.   While the office is being renovated, another team within SkinCure completes all the required regulatory applications, including a radiation safety plan.

105.   Upon completion of the office renovation, SkinCure delivers the necessary equipment to the practice.  A manufacturer-provided engineer installs the equipment, and a physics team calibrates it. The equipment consists of, among other things, a Sensus Healthcare SRT-100 Vision System.

106.   After the equipment is installed, SkinCure provides a clinical training program.

107.   The clinical training is conducted by SkinCure's CMO, Dr. Daniel Ladd. During this training, SkinCure helps the practice identify patients and shows the practice how to educate patients on treatment options.

108.   SkinCure also "leases" to the practice a radiation treatment therapist ("RTT"). The PSA states that the practice is required to pay SkinCure $45 per hour for RTT services.

109. The RTT is an employee of SkinCure who is "placed" in the dermatology practice. According to SkinCure, the RTT is placed with the practice "to facilitate treatment under [the dermatologist's] medical direction. In addition to assisting with patient treatments, the RTT will enter notes into [the] EMR/PM systems, manage maintenance and repairs of the equipment…provide assistance to [the] radiation safety officer, maintain [the] radiation protection binder, and advise on appropriate patient selection, prescription guidelines, set-up treatment parameters, modality processes, and ultrasound image findings."[15]

110. In actuality, and as further explained *infra* in Section VII, the RTT effectively oversees and performs all of the radiation therapy without supervision by the dermatologist or any other physician.

111. The RTT remains at all times on SkinCure's payroll, is paid by SkinCure, and is "leased" to the practice. SkinCure has sole responsibility over administrative and employment matters, including setting the RTT's work schedule, job duties, and discipline.

112. Finally, SkinCure provides verification of benefits and "claims integrity support" for the practice, so that bills for treatments performed by the RTT have a high likelihood of being paid.

---

[15] *Implementation    Plan:    What    Happens    Next*,    SkinCure, https://www.skincureoncology.com/business-model/implementation-plan/ (last visited Apr. 13, 2022).

### 2. IG-SRT and Related Treatments

113. Once the physician decides to pursue "IG-SRT" treatment for an individual patient, the patient reviews and signs an informed consent to discuss treatment expectations.

114. Some doctors then conduct an evaluation/simulation. Simulation is the process by which the patient's cancer is evaluated, and the target area for the radiation treatment is identified.

115. Conducting a simulation requires medical decision-making (to account for each patient's physical makeup and any underlying conditions the patient may have). In the case of SkinCure, the RTT typically performs and evaluates the simulation with no physician present.

116. The simulation is documented with photos, ultrasound images, and treatment parameters that are entered into a computer for reproducibility. Typically, no treatment is provided on the day the simulation is conducted.

117. A treatment plan for the patient is then created (typically *by the RTT*, not the doctor).

118. The "treatment plan" is a cookie cutter affair, i.e., "treatment plans" are virtually identical for every patient and consist of 20 evaluations/simulations, 25 ultrasounds, 20 SRT treatment sessions, and four "evaluation and management" consultations during the course of treatment.

119.    In this way, the vast majority of patients are run through SkinCure's scheme like bovines through a cattle chute.

120.    Once the "treatment plan" is initiated, the SkinCure RTT—not the doctor—typically performs all of the work, e.g., the evaluations, the ultrasound, and the actual SRT treatments.

### 3.    SkinCure's Billing Process

121.    Under the PSA, SkinCure is typically responsible for support services, including for medical-claim reimbursement to the partner practice. In fact, SkinCure prepares all the medical billing for the "IG-SRT" services for approximately 75% of its dermatology practice partners, with no contribution from these partners to Skin-Cure's billing services.[16]

122.    The PSA gives SkinCure control over virtually every aspect of the practice's medical billing. That control is summarized below:

    a.    The practice grants SkinCure a power of attorney to perform administrative services related to medical billing for IG-SRT radiation treatment;

    b.    The practice promises to promptly provide SkinCure with all requested billing information SkinCure needs for its reimbursement services; and

    c.    The practice provides SkinCure with access to its electronic medical records ("EMR") system.

---

[16] Approximately 25% of SkinCure's partners maintain some level of control over the billing for the IG-SRT services.

123.    In practice, SkinCure employees prepare the medical billing on the partner practice's EMR system for the radiation therapy services SkinCure provided. Skin Cure employees then send this information to SkinCure's partner physicians, who then submit (and certify the accuracy and legal compliance of) the bills to Medicare and other government programs.

124.    COO and Compliance Officer Steven Scott and Director of Revenue Janine Heenschel authored the template treatment plans and billing code protocols. They determined what codes the physician, through SkinCure's employees, should or should not bill, as well as how often they should be billed. Scott and Heenschel then passed these directives down to the supervisors of various departments, who train new employees accordingly.

125.    New SkinCure employees receive a training sheet from management that specifies what and how often they are to code the billing for various standard skin cancer scenarios, *e.g.* codes for one lesion, codes for two lesions, the code for a simulation, the code for ultrasound, the code for a radiation treatment, *etc.*:

**20 Fractions Single Lesion**

| CPT CODE | DESCRIPTION | Number of Units Per Course | National Average Global MAC Reimbursement Allowable | Totals Based on the Number of Units | Primary |
|---|---|---|---|---|---|
| 77261 | Therapeutic Radiology Treatment Planning | 1 | 77.94 | 77.94 | 62.35 |
| 77280 | Image Guided Field Placement | 21 | 313.17 | 6,576.57 | 5,261.26 |
| 77300 | Radiation Therapy Dose Plan-Field Calculation | 1 | 73.62 | 73.62 | 58.90 |
| 77331 | Special Radiation Dosimetry | | 71.24 | 0.00 | 0.00 |
| 77334 | Radiation Treatment Aid(s) | 1 | 141.48 | 141.48 | 113.18 |
| 77336 | Radiation Physics Consult Weekly | 4 | 90.34 | 361.36 | 289.09 |
| 77401 | SRT Delivery | 20 | 27.71 | 554.20 | 443.36 |
| 77427 | Radiation Management Weekly | 4 | 208.12 | 832.48 | 665.98 |
| 99211 | Simple Office Visit | | 23.07 | 0.00 | 0.00 |
| 99213 | Intermediate Office Visit | | 75.32 | 0.00 | 0.00 |
| 99214 | Complex Office Visit | 1 | 110.28 | 110.28 | 88.22 |
| G6001 | Ultrasound Evaluation - Ultrasound Guidance | 25 | 131.18 | 3,279.50 | 2,623.60 |
| | | | | | 9,605.94 |

Ex. 1.

126.    As noted, Scott and Heenschel designed these protocols.  They did not base the protocols on CMS training or CMS guidance.

127.    In fact, SkinCure emphasized to its employees that it was not a "revenue-cycle operation" and therefore was not subject to CMS guidelines.[17]

## VII.    SKINCURE CAUSED AND CONTINUES TO CAUSE THE SUBMISSION OF FALSE CLAIMS

### A.    SkinCure Caused and Continues to Cause the Submission of Claims in Violation of the AKS and the Stark Law

128.    Reimbursement claims to government insurers that are tainted by AKS and Stark violations are not reimbursable for at least two reasons: (1) the AKS, the

---

[17] Though SkinCure hired employees with revenue-cycle experience, the company explained to its employees that they were not medical billers.  Scott went so far as to change employee titles so as not to reflect that they handled medical billing.  For example, the title of an employee who worked on billing at SkinCure, and who was performing billing functions, was called a "Charge Integrity Specialist."

Stark Law, and the FCA specifically so provide, and (2) such claims violate the certifications made by providers when submitting claims, i.e., when providers submit claims, they certify that the claims do not involve services provided in violation of the AKS or the Stark Law.

129.   For example, on every bill submitted to Medicare, there is a certification stating that "this claim, whether submitted by me or on my behalf by my designated billing company, complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment including but not limited to the AKS and Physician Self-Referral law (commonly known as Stark law)."

130.   Thus, if a claim does not comply with the AKS or the Stark law, the certification which accompanies the claim is false.

131.   SkinCure representatives explicitly solicit partner physicians to identify good candidates for "IG-SRT" radiation treatment and to refer those candidates to SkinCure's RTT for consultation.

132.   Once SkinCure's treatment plan and billing protocols are implemented and begin to result in payments from Medicare and other government health programs, SkinCure and the partner physician practices split the proceeds 60%/40%. This arrangement violates both the AKS and the Stark Law.

### B. SkinCure Caused and Continues to Cause the Submission of False Claims for Medically Unnecessary Services

133. As noted, in order for a treatment to be reimbursable under the medical necessity requirement, it must meet numerous conditions, including that the treatment is:

> Appropriate, including the duration and frequency that is considered appropriate for the item or service, in terms of whether it is:
> - Furnished in accordance with accepted standards of medical practice for the diagnosis or treatment of the patient's condition . . . [and]
> - One that meets, but does not exceed, the patient's medical need.

Medicare Program Integrity Manual, § 13.5.4.

134. Ultrasound is never medically necessary in the context of superficial radiation treatment of non-melanoma skin cancer, for several independent reasons.

135. First, the standards of medical practice relating to SRT treatments do not include the use of ultrasound to "guide" the radiation machine; therefore, using ultrasound for that purpose violates the "standards of practice" requirement.

136. Second, using ultrasound in connection with SRT treatment exceeds the patient's medical need, because such cancer is readily detectable by the naked eye and does not require the sophisticated and deep-penetrating imaging of an ultrasound to "see" inside the patient's body, below the skin.

137.   Third, although using ultrasound in connection with an initial simulation/evaluation of the cancer can *potentially* be justified, subsequently using ultrasound twenty five more times violates the "frequency" requirement.

138.   A clear signal that SkinCure has been performing and billing for unnecessary ultrasounds is that private insurance companies routinely reject many of SkinCure's ultrasound claims as medically unnecessary, while CMS pays them. In fact, most private insurance companies do not even authorize a single ultrasound for radiation therapy.

139.   SkinCure has similarly been performing and billing for medically unnecessary simulations under CPT Code 77280.   As described *supra* in Section IV.D.2, a simulation is a procedure to determine the size and location of ports to be used for radiation therapy.   In other words, a simulation strategizes the treatment plan. Thus, in the usual course of treatment, a simulation is performed at most *once* at the beginning of treatment to determine the treatment's parameters.   Yet SkinCure's standard billing protocol is to perform and bill for a simulation *20 more times* during the course of a patient's radiation treatment.  Ex. 1.

140.   Performing and billing these 20 additional simulations is medically unnecessary for three independent reasons.

141.    First, the standards of medical practice justify a simulation to be performed once at the beginning of treatment; therefore, billing the simulation an additional 20 times violates the "standards of practice" requirement.

142.    Second, performing a simulation exceeds the patient's medical need, because the purpose of the simulation is to determine the parameters at the outset of treatment, and it is not to be performed in conjunction with each subsequent SRT treatment.

143.    Third, performing and billing a simulation 20 more times than is necessary violates the "frequency" requirement.[18]

### C.    SkinCure Bills the Government for Services Which Are Neither Performed Nor Supervised by a Physician

144.    SkinCure RTTs perform all or virtually all of the medical services for which the government is billed and pays.  The RTTs work alone, despite legal requirements and regulations that physicians perform the procedures or, in the case of purely technical codes 77401–77416, that the RTTs be supervised.

145.    For example, in the case of codes 77401-77416, the partner physicians typically do not provide the direct personal supervision required by the Medicare

---

[18] In an effort to obfuscate these violations, SkinCure falsely labels its billing codes.  For example, CPT 77280 is the correct code to use for the initial simulation/evaluation of non-melanoma skin cancer.  However, SkinCure labels this code as "Image Guided Field Placement" on its bills submitted to the government.  This false description serves to conceal the fact that SkinCure has been billing more than twenty times for a procedure that should have been performed once. Ex. 1.

Benefit Policy Manual, that is, they are not "in the area and immediately available to provide assistance and direction [to the RTT's] throughout the time the procedure[s] [were] being performed."

146.  As to evaluations/simulations billed under CPT 77280, the RTTs typically perform these medical evaluations themselves.  As described *supra* in Section VI.D.2, a simulation is a procedure to determine the size and location of ports to be used for radiation therapy and strategizes the treatment plan.  As such, it is a specialized procedure which requires medical decision-making.

147.  In fact, CPT 77280 requires there to be evidence of physician participation in reviewing the images and in decision-making to bill the code.  Under SkinCure's business model, this physician participation is absent.

148.  CPT Code 77334, for the design and construction of treatment devices, is another code that SkinCure abuses in its billing practices.  CPT Code 77334 requires the physician, not the RTT, to design the treatment device.  Yet RTTs typically perform all aspects of treatment, including design of treatment devices.  This is another violation of the physician performance requirement.  Further, proper documentation of the physician's direct involvement in the device design, selection, and final placement is essential when this is billed as a complex procedure.  SkinCure does not meet this condition of payment, and for the vast majority of cases, has no

documentation of the physician's performance when it bills Medicare for services under code 77334.

149.    Another code that SkinCure causes to be falsely billed is CPT 77300 (for basic radiation dosimetry calculation). This procedure is aimed at finding the right dose and method of radiation therapy based on the type and stage of cancer to be treated, and must be performed by a dosimetrist and/or a physicist. SkinCure's RTTs almost always perform this procedure, and thus SkinCure causes this code to be falsely represented to Medicare as performed by the appropriate provider.

150.    Additionally, the only point at which the partner physicians typically supervise the RTT's treatment of the patients is during the weekly "treatment management session." This weekly "check-in" with the patient is billed under CPT 77427, an evaluation and management code which must be performed by the physician. SkinCure's business model contemplates that the physicians attend these meetings, but the RTTs conduct them, including by apprising the patients of the progress in their treatment. Each time that it billed code 77427, SkinCure falsely represented a treatment management session to Medicare as performed by a physician.

151.    Finally, partner physicians routinely do not timely sign and submit the billing statements for the radiation therapy services. Instead, partner physicians typically "batch sign" large volumes of billing statements electronically, often all in one day, long after the service date.. See, e.g., Ex. 2.

**D. SkinCure Causes the Submission of False Claims for Payment For Services Not Qualified for Reimbursement Under the Billed CPT Codes**

152.    SkinCure causes its partner physicians to submit for reimbursement CPT codes that the CPT Manual prohibits from being jointly billed.

153.    For example, according to the CPT Manual, when performing superficial radiation for skin cancer under CPT code 77401, the codes 77261 [Therapeutic Radiology Treatment Planning], 77334 [Radiation Treatment Aid(s)], and 77336 [Radiation Physics Consult Weekly] may not be billed.    Yet SkinCure causes its partner physicians to bill for all four of these, sometimes for multiple units, amounting to approximately $1,135 in additional revenue per patient. Ex. 1.  A bill properly submitted without codes 77261, 77334, and 77336 would have totaled at most $540 per patient.  *Id.*

154.    Additionally, various codes that require precise documentation of the physician's performance were not submitted with the required documentation.  For example, code 77334, as discussed *supra* in Section VII.C, a procedure that Skin-Cure billed for each of its patients, requires documentary proof which SkinCure's partner physicians did not provide.

## VIII. CAUSES OF ACTION

### COUNT I

#### Violation of the False Claims Act – 31 U.S.C. § 3729(a)(1)(A)

155.  Relators repeat and re-allege each and every allegation contained in the paragraphs above as though fully set forth herein.

156.  In violation of 31 U.S.C. § 3729(a)(1)(A), SkinCure knowingly caused the submission of false or fraudulent claims for payment or approval to (1) officials of the United States and/or (2) contractors, grantees, or other recipients of money provided by or that would be reimbursed by the United States.

157.  By virtue of the false or fraudulent claims that SkinCure caused to be presented, the United States has suffered actual damages and is entitled to recover treble damages and a civil penalty of $23,607 for each false claim occurring after November 2, 2015.

### COUNT II

#### Violation of the False Claims Act - 31 U.S.C. § 3729(a)(1)(B)

158.  Relators repeat and re-allege each and every allegation contained in the paragraphs above as though fully set forth herein.

159.  In violation of 31 U.S.C. § 3729(a)(1)(B), SkinCure knowingly made, used or caused to be made or used, false records or statements material to false or fraudulent claims for payment or approval to (1) officials of the United States and/or

(2) contractors, grantees, or other recipients of money provided by or that would be reimbursed by the United States.

160.   The false records and statements made, used or caused to be made or used by SkinCure had a natural tendency to influence or be capable of influencing the payment of the claims.

161.   By virtue of the false records and statements made, used, or caused to be made or used by SkinCure, the United States has suffered actual damages and is entitled to recover treble damages and a civil penalty of $11,803 – $23,607 for each false claim occurring after November 2, 2015.

## COUNT III

### Violation of the False Claims Act - 31 U.S.C. § 3729(a)(1)(C)

162.   Relators repeat and re-allege each and every allegation contained in the paragraphs above as though fully set forth herein.

163.   In violation of 31 U.S.C. § 3729(a)(1)(C), SkinCure conspired with its partner practices to commit violations of the False Claims Act, including the violations in Count I and Count II described above.

164.   Through the conduct described in this Complaint, SkinCure reached an agreement with its partner practices to commit violations of the False Claims Act, including the violations in Count I and Count II described above, and committed overt acts toward the commission of such violations.

165. SkinCure's conspiracy had a natural tendency to influence and was capable of influencing the payment of the claims.

166. By virtue of SkinCure's conspiracy, the United States has suffered actual damages and is entitled to recover treble damages and a civil penalty of $11,803 – $23,607 for each false claim occurring after November 2, 2015.

## IX.    REQUEST FOR RELIEF

WHEREFORE, Relators, on behalf of the United States, demand that judgment be entered in their favor and against Defendant for:

(i)    Three times the amount of damages to the government;

(ii)   Civil penalties of no more than $23,607 and no less than $11,803 for each violation of the FCA that occurred on or after November 2, 2015;

(iii)  Any other recoveries or relief provided for under the FCA;

(iv)   Relators' receipt of the maximum amount permitted by law of the proceeds of this action or settlement of this action collected by the United States, plus reasonable expenses necessarily incurred, and reasonable attorneys' fees and costs, based upon the total value recovered, both tangible and intangible, including any amounts received from individuals or entities not parties to this action; and

(v)    Such other relief as the Court may deem appropriate.

## X.    DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), a jury trial is demanded in this case.

Date: April 18, 2022                Respectfully submitted,

/s/ Lawrence S. Klitzman
Lawrence S. Klitzman, Esquire
Florida Bar Number 312878
KLITZMAN LAW GROUP. PLLC
1301 International Parkway, Ste.120
Sunrise, FL 33323
Telephone: (954) 713-9680
LSK@Klitzlaw.com

**WALDEN MACHT & HARAN LLP**
Daniel R. Miller, Esquire
2000 Market Street, Suite 1430
Philadelphia, PA 19103
Telephone: (215) 825- 5280
dmiller@wmhlaw.com

Counsel for Plaintiffs-Relators